# SUPREME JUDICIAL COURT

FOR THE

## COUNTY OF NORFOLK, OCTOBER TERM 1844,
## AT DEDHAM.

PRESENT.

Hon. LEMUEL SHAW, Chief Justice.
Hon. SAMUEL S. WILDE,
Hon. CHARLES A. DEWEY, } Justices
Hon. SAMUEL HUBBARD,

## William H. Cary vs. Albert Daniels.

Tenants in common of an ancient mill and water privilege erected, below their mill, a new dam and a smaller mill, on their own land; and while they owned both mills, it was the practice, whenever the lower dam so raised the water as to obstruct the upper mill, for a workman in the upper mill to go down, over the land owned by the tenants in common, and open the waste gate of the lower dam, and thus relieve the upper mill from back water: Afterwards, each of the tenants in common, by a separate deed, conveyed his undivided part of the upper mill, and the land near it, to W., in these terms: "A certain parcel of land" (described) "together with one undivided" (fractional) "part of the privilege of water, creek, factory, saw mill, dwelling-houses and other buildings, situate on the premises, and of the water wheels, main gear, main drums, connected with the said factory and saw mill, and of all the privileges and appurtenances thereunto belonging;" and in each deed was a covenant that "the aforegranted premises" were free from all incumbrances brought thereon by the grantor: W. conveyed the upper land and buildings, with all the privileges and appurtenances, to C., who was one of the former tenants in common: W. and D. afterwards became the owners of the lower land, dam and mill, and W. released all his right therein to D., who abandoned the dam, and erected another, for the use of the mill, lower down the stream, and by means thereof threw back the water upon the wheel of C.'s mill, whereby its movements were obstructed.

*Held*, in a suit by C. against D. for the obstruction thus caused, that C. took the upper dam, mill and privilege, as they existed, and were modified and appropriated by the lower

dam, when the conveyance was made to W.; and that he did not acquire a right to the unobstructed flow of the water from his mill. *Held also,* that the right to use the water below C.'s mill, as that right was modified by the appropriation previously made for the lower mill, was not an incumbrance on the upper mill and privilege, within the meaning of the covenant made against incumbrances by W.'s grantors, but was a parcel of the lower estate. *Held also,* that D., by removing his dam lower down the stream, exercised his rights justly, and without injury to C., if he thereby made only the same appropriation of the stream that was made by his dam and mill, as they stood before; but that, if D. raised his new dam higher than his old one, so as to appropriate to himself an increased portion of the stream, and set back water upon the wheel of C.'s mill, he was answerable to C. in damages. *Held also,* that C. was not entitled to recover damages of D. on the ground that the removal of D.'s dam lower down the stream had prevented C. from opening the waste gates therein, or had rendered the opening of them more onerous or expensive

TRESPASS UPON THE CASE. In the first count in the plaintiff's declaration, he averred that on the 7th of March 1837, and thence to the day of the date of his writ, he was seized and possessed in his demesne, as of fee, of two acres of land, with a water mill thereon, and the water privilege thereto appertaining, on Charles River, in Medway, with all the privileges and appurtenances thereto belonging, and ought, during all the time aforesaid, to have had the uninterrupted enjoyment of said mill privilege, without any molestation from the defendant; but that the defendant, on said 7th of March, erected a dam across said river, below the plaintiff's said mill and land, and had continued the same hitherto, and thereby, during all that time, raised the water in said river above its usual and due height, and caused the water to flow back upon the wheel of the plaintiff's said mill, and thereby obstructed and prevented the plaintiff in the use thereof, and deprived him of the profits of the same, &c.

In the second count, the plaintiff averred that the defendant, on the 7th of March 1837, and on divers other days between said day and the day of the date of the plaintiff's writ, put, kept up and continued, a certain obstruction in said Charles River, and caused the water thereof to flow back upon the plaintiff's mill wheel, and prevented the water from flowing and passing from the said mill wheel along said river, in the usual course, and as of right it ought to have flowed and passed off, and thereby caused back water upon the plaintiff's said wheel

and obstructed and hindered the plaintiff in the use of his mill, &c.

The case was tried before *Dewey*, J. whose report of the trial was as follows  It appeared in evidence that the plaintiff owned one mill on Charles River, and the defendant another; the plaintiff's mill being about a quarter of a mile above the defendant's:  That prior to the year 1833, both of said mills, and the intervening land on the banks of the river, were owned by William Feltt, Gilbert Clark, Jacob Hall, Luther Capron, and William H. Cary, the plaintiff in this case:  That the upper mill was on an ancient privilege, and was the oldest and much the largest:  That when the lower mill was built by the owners of the upper mill, a dam was made, which was abandoned in 1832, and another erected by said owners lower down the stream; (the former of these dams was called, at the trial, the *old dam*, and the latter the *middle dam.*)  It also appeared that there was a waste gate in the latter dam ; but its size was not proved.

The plaintiff introduced the following deeds of the upper mill and some of the land adjacent to it, conveying the same to James B. Wilson; viz. a deed from Gilbert Clark, of one undivided fourth thereof; from William Feltt, of three undivided eighths thereof; from Jacob Hall, of one undivided fourth thereof; and from Luther Capron, of one undivided eighth thereof.  The first three of these deeds were dated July 17th 1833, and the last was dated September 21st 1833.  Each of these deeds contained these words:  " To have and to hold the above granted premises, with all my right, title, interest and estate, in and to the privileges and appurtenances to the said land and tenements belonging, to him, the said James B. Wilson, his heirs and assigns, to his and their use and behoof forever."  Each of these deeds conveyed the land therein described, together with an undivided part " of the privilege of water, creek, factory, saw mill, dwelling-houses and other buildings situate on the premises, and of the water wheels, main gears, main drums, connected with the said factory and saw mill, and of all the privileges and appurtenances thereunto belonging."  And in each of these deeds was a covenant that the granted premises

were "free from all incumbrances brought thereon" by the grantor. The plaintiff also introduced a deed, made by him to said William Feltt, of one undivided eighth of said upper mill and land, dated before July 17th 1833. These deeds left the grantors seized of the lower mill and the land between that and the upper mill, including the sites of the old and the middle dam. The plaintiff also introduced a deed, made to him by said James B. Wilson, dated March 7th 1837, conveying (with some reservations) the same which Wilson acquired by the deeds above mentioned, "with all the privileges and appurtenances." In this deed, Wilson covenanted with the plaintiff, his heirs and assigns, to warrant and defend "the said premises" against the lawful claims of all persons claiming through or under him, but not otherwise.

It appeared in evidence, that prior to the aforesaid conveyances to Wilson, and while the upper and lower mills and the intervening land were all owned by said Clark, Feltt, Hall and Capron, as tenants in common, it was the practice, whenever such a rise of water was caused by the middle dam as to obstruct the upper mill, for one of the workmen employed in the upper mill to go down over the land of the tenants in common, and open the waste gate at the middle dam, and thus relieve the upper mill from back water; and that this practice continued down to the time when Wilson became the owner of the upper mill.

The defendant offered to prove, by Wilson, that when he bought the upper mill, he did not know of the existence of this practice, and did not know that he had any right to open said waste gate; and Wilson so testified. This evidence was admitted, as competent, for the purpose of tending to prove that the practice did not exist; but it was ruled, that if the usage did exist, and a right had thereby attached to the upper mill, it was immaterial whether Wilson knew of it, or not; and that his ignorance would not affect his legal rights.

It appeared that the abovenamed Gilbert Clark, and William H. Cary, (the plaintiff,) and Luther Capron, by a deed dated September 21st 1833, conveyed their several interests in the

lower mill, and the land between that and the upper mill, to William Feltt and Jacob Hall, the other part owners. In that deed was this covenant: " And we, the said Clark, Cary and Capron, do hereby, each of us for himself, his heirs, executors and administrators, and not for the other, or their heirs, executors or administrators, covenant with the said Feltt and Hall, their heirs and assigns, that the above granted premises are *free from all incumbrances brought thereon by us.*"

It further appeared, by deeds which were put into the case, that the defendant and Wilson afterwards became owners, as tenants in common, of said mill and land; and that, on the 5th of March 1838, the defendant became sole owner thereof, by virtue of a quitclaim deed from said James B. Wilson, conveying to him one undivided moiety of the same; that in the year 1837, the middle dam was carried away by the water; and that the defendant, in the summer of 1838, built a new dam lower down the stream.

The plaintiff contended that he was entitled to an unincumbered mill privilege; also, that he was entitled to such a privilege as the upper mill was, with the waste gate of the middle dam open whenever there was a rise of water sufficient to obstruct the upper mill. He also contended that the new dam did not afford to him, as owner of the upper mill, the same facilities for clearing that mill of back water, as the middle dam did, by opening the waste gate, and that, being at a greater distance from his mill, a greater burden was thereby imposed on him. He further contended that the new dam, as constructed and used, was more injurious to him than the middle dam with the gate closed.

The defendant denied that the middle dam, with the waste gate closed, would have been less injurious to the plaintiff than the new dam : And he asked that the jury might be instructed, " 1st, that the practice, while both of the mills and the intervening land were held and occupied by those who owned them as tenants in common, for a person to go down from the upper mill over the land of the tenants in common, and open the gate to relieve the upper mill from back water, although continued

down to the time of the conveyances to Wilson, would not, in connexion with these conveyances, operate to grant to Wilson the right or easement to go down over the land of the grantors, which was not conveyed to him, and open the gates to relieve the upper mill from back water ; and 2d, that if any such right was conveyed, this declaration does not, in point of law, describe, nor allege any violation of it, nor can the plaintiff recover for a violation of such right, in this action."

The judge instructed the jury, " that Wilson, by force and effect of his deeds from persons jointly owning and occupying both mills and dams, acquired the right to the use of the upper dam and mill privilege, as respects the dam below, in the same manner that the grantors were accustomed to use the same, and did use the same at the time of their making such conveyances to Wilson, so far as such use was necessary for the convenient and useful operation of the upper mill ; that is, that if the occupants of the upper mill had been accustomed, before and down to the time of the making of the deeds to Wilson, to go down and open the gate of the dam below, when necessary to prevent back water, that the plaintiff had the same right, under the deeds to Wilson, to go down and open the gates of the dam below, for the like purpose."

The jury were further instructed, as to the change of the site of the lower dam, (it having been removed, as the evidence tended to show, 450 feet further from the upper dam, measuring by the road, and 750 feet, by the course of the stream,) that the owners of the lower dam had no right thereby to subject the owners of the mill above to any greater inconveniences and obstructions thereby, than they were subjected to by the former dam :   That the owners of the dam below ought not, by means of said new dam, to cause any substantial increase of labor or expense to the owners of the mill above, in enjoying their privilege :   That if the facilities which were attached to the upper mill, and were enjoyed by the owners thereof, in preventing back water by means of their opening the gates at the middle dam, were substantially affected by the change of the site of that dam to a place more distant, it would be incumbent

on the owners of the lower mill and the dam thus erected on the new site, to provide means for securing as great facilities for preventing back water at the upper mill, as had been previously enjoyed, and so to manage the new dam, that no labor or expense would devolve upon the occupiers of the upper mill, in preventing back water, beyond what was required by the dam in its former state.

Much evidence was offered by the plaintiff, tending to show that the new dam was so constructed that it operated injuriously to him, and was in violation of his privilege, even taking the privilege to be the restricted one contended for by the defendant, viz. the free and unincumbered right of the defendant to the use of the middle dam, with the gate closed, and the plaintiff having no right to go down and open the same, to relieve from back water. There was also much evidence on the part of the defendant, tending to show the contrary. This presented a question of fact, which was distinctly submitted to the jury, with instructions that if, upon this point, they should find for the plaintiff, they would, in assessing damages, state the sum they should find for this cause, independent of the other alleged claim for damages. The jury found for the plaintiff on this point, and assessed his damages therefor at $300.

Upon the other ground on which the plaintiff claimed damages, viz. the defendant's unlawful obstruction of, or interference with, the rights of the plaintiff to relieve his mill from back water, by going down to the defendant's dam and opening his gates, the jury were instructed, as to the legal rights of the parties, as above stated, and were further instructed, if they should find for the plaintiff on this claim, to consider and estimate the damages therefor distinct from, and independent of, the damages, if any, which they might find for the other alleged injury. The jury found for the plaintiff on this second ground, and assessed his damages at $100.

A general verdict was then returned for the plaintiff for $400.

This form of assessing damages separately was adopted by the presiding judge, with a view of more conveniently reserving the questions of law which are raised.

Judgment to be rendered on the verdict, if the rulings of the judge were correct, and if the declaration is such as to authorize a judgment upon the grounds on which the verdict was rendered ; otherwise, the verdict to be amended, or a new trial granted, as the whole court shall order.

The argument was had at the last October term.

*B. R. Curtis*, for the defendant. The right to go over the land of Wilson's grantors, and let off the water from the dam of the lower mill, did not pass to him. The terms of the grant created no right *de novo*. All that was meant to be conveyed was expressly mentioned. If the right passed, it passed as an incident to the main thing conveyed. The nature of the right now claimed by the plaintiff is, therefore, to be examined, in order to give a construction to the deeds of grant. First, a right of way is claimed, and secondly, a right to let off the water; two easements in the grantors' land. These rights are not necessary for the upper mill, but only for the convenient use of it.

The conveyance of a mill passes the land and all *existing* easements, annexed to the thing granted, either by nature or necessity. Easements must be in others' lands, unless otherwise granted in express terms. See *Grant* v. *Chase*, 17 Mass. 447 *Barlow* v. *Rhodes*, 1 Crompt. & Mees. 448. *Plant* v. *James*, 5 Barn. & Adolph. 794. *Lord Darcy* v. *Askwith*, Hob. 234. *Archer* v. *Bennet*, 1 Keb. 736. There cannot be such an easement or servitude as requires the owner of the servient estate to do any thing ; as, for example, to open the gates of a dam. Gale & Whatley on Easements, (Amer. ed.) 4, 215. Hugo lu Droit Romain, § 202.

But if the plaintiff acquired the easements which he claims, his declaration is not so framed as to cover damages for a violation thereof. The jury have assessed damages for the addition al inconvenience of the plaintiff in going further down the stream than when the former dam existed, to let off the water. Neither count in the declaration alleges damages from that cause. Only one tort is alleged ; and no precedent warrants a severance of damages, when a single tort is the ground of ac tion. See *Horner* v. *Watson*, 6 Car. & P. 680.

40 *

The plaintiff will rely on the covenants, in the deeds to Wilson, against incumbrances caused by the grantors. But those covenants apply only to the " premises " conveyed ; and these premises were a restricted privilege, viz. the privilege as it existed at the date of the deeds. The same effect is to be given to the like covenants in the deeds conveying the lower land and mill. In the deed of that land and mill, given by Clark, Capron, *and the plaintiff*, to Feltt and Hall, through whom the defendant derives title, there was a covenant that the premises were free of all incumbrances brought thereon by the grantors. On the plaintiff's construction, this covenant operates against him, as much as the covenants in the deeds to Wilson operate in his favor.

*Choate & Wilkinson*, for the plaintiff. Wilson acquired the right to have the water pass off without any obstruction caused by his grantors; and he transferred that right to the plaintiff. *Tyler* v. *Wilkinson*, 4 Mason, 400. *Wright* v. *Howard*, 1 Sim. & Stu. 203. *Mason* v. *Hill*, 5 Barn. & Adolph. 17, 25. Angell on Watercourses, (3d ed.) 3. 2 Hilliard's Ab. 130. And the defendant's grantors conveyed to him no easement for the benefit of the lower mill. Gale & Whatley on Easements, (Amer. ed.) 88, 129. *Johnson* v. *Jordan*, 2 Met. 240, 241. They granted to him the lower mill and privilege, as it existed, viz. as a servient estate. And the deeds of the upper mill and privilege, given to Wilson, conveyed to him the right, as it then existed and was used, viz. as a dominant estate. *Oakley* v. *Stanley*, 5 Wend. 523. *Whitney* v. *Olney*, 3 Mason, 280. *Moore* v. *Fletcher*, 4 Shepley, 63. *U. States* v. *Appleton*, 1 Sumner, 492. *Leonard* v. *White*, 7 Mass. 6. *Blake* v. *Clark*, 6 Greenl. 436. *Blaine* v. *Chambers*, 1 S. & R. 169. *Pickering* v. *Stapler*, 5 S. & R. 107. *Strickler* v. *Todd*, 10 S. & R. 63. *Watrous* v. *Watrous*, 3 Connect. 373. And the grantors covenanted that the conveyed premises were free from any incumbrance brought thereon by them. This covenant, being before the grant to the defendant, prevented the defendant from gaining an easement by a subsequent deed from the same grantors.

An easement, created while there is unity of ownership and possession, passes by a conveyance of the dominant estate. See *Hazard* v. *Robinson*, 3 Mason, 272. *Hathorn* v. *Stinson*, 1 Fairf. 224. *Preble* v. *Reed*, 5 Shepley, 169.

The declaration covers all the damages which were returned by the jury. It complains of the dam, which was the cause of all the damages.

SHAW, C. J. The leading fact in the present case is, that at the time when Hall and others, under whom the defendant claims, conveyed the upper mill to Wilson, under whom the plaintiff claims, they were also the owners of the lower mill, the dam of which is complained of, by the plaintiff in this action, as a nuisance. The complaint is, that the lower dam is so raised as to set back the water and obstruct the free use of the plaintiff's water wheels.

Two questions were made at the trial. 1. Whether, as contended for by the plaintiff, he is not entitled, as against the defendant, to a free and unobstructed use of the stream below his mill, including a right to have the water run off as low as it would run in its natural bed ; or whether, as the defendant contends, the plaintiff is entitled to no greater privilege, in this respect, than that which was used for the upper mill against the lower, with the dam raised to the same height to which it was raised when the conveyance was made from the owners of both mills to Wilson. 2. Whether the plaintiff and those under whom he claims, with the conveyance of the upper mill, acquired a right to continue a practice, which had formerly existed when both mills were owned by the same persons, for the occupants of the upper mill, in times of high water, to go down to the middle dam and open the waste gates therein, and by this means relieve the upper mill from back water; and, if so, whether it was a violation of this right, for which the plaintiff can maintain an action, that the defendant had taken away the middle dam, and erected his dam several hundred feet lower down, by means of which, and by the mode of constructing his new dam, he had rendered it impracticable, or more burdensome and expensive, to exercise such right of opening the waste gates and relieving his mill from back water

On the first point, we are of opinion that the claim cannot be maintained. It is placed on the ground, that the owner of land, through which a stream of water passes, has a right to the run of the water in its natural channel through his land; that a grant of the land, *primâ facie,* and without express reservation, is a grant of such right, and therefore that a grant to Wilson, by Hall and others, who were then owners of both mills, was a grant of an unobstructed flow of the stream below the land granted; and hence, that the grantors could not erect any dam, or maintain any dam already erected, which would in any manner obstruct the flow of the stream in its natural channel, and that the defendant, being privy in estate with those grantors, took the lower mill subject to the same right of the grantee and his assigns. The plaintiff also relies upon the covenants, contained in the deeds of the same grantors to Wilson and his assigns, that the granted premises were free from all incumbrances brought thereon by them, and that, if there was a right to maintain the lower dam, so as in any degree to throw back water upon the plaintiff's mill, it would be an incumbrance.

It is agreed on all hands, that the owner of a parcel of land, through which a stream of water flows, has a right to the use and enjoyment of the benefits to be derived therefrom, as it passes through his own land; but as this right is common to all through whose lands it flows, it follows that no one can wholly destroy or divert it, so as to prevent the water from coming to the proprietor below; nor can a lower proprietor wholly obstruct it, so as to throw it back upon the mills or lands of the proprietor above. We, of course, now speak of rights at common law, independent of any modification thereof by statute. But one of the beneficial uses of a watercourse, and in this country one of the most important, is its application to the working of mills and machinery; a use profitable to the owner, and beneficial to the public. It is therefore held, that each proprietor is entitled to such use of the stream, so far as it is reasonable, conformable to the usages and wants of the community, and having regard to the progress of improvement in hydraulic

works, and not inconsistent with a like reasonable use by the other proprietors of land, on the same stream, above and below. This last limitation of the right must be taken with one qualification, growing out of the nature of the case. The usefulness of water for mill purposes depends as well on its fall as its volume. But the fall depends upon the grade of the land over which it runs. The descent may be rapid, in which case there may be fall enough for mill sites at short distances; or the descent may be so gradual as only to admit of mills at considerable distances. In the latter case, the erection of a mill on one proprietor's land may raise and set the water back to such a distance as to prevent the proprietor above from having sufficient fall to erect a mill on his land. It seems to follow, as a necessary consequence from these principles, that in such case, the proprietor who first erects his dam for such a purpose has a right to maintain it, as against the proprietors above and below; and to this extent, prior occupancy gives a prior title to such use. It is a profitable, beneficial, and reasonable use, and therefore one which he has a right to make. If it necessarily occupy so much of the fall as to prevent the proprietor above from placing a dam and mill on his land, it is *damnum absque injuriâ*. For the same reason, the proprietor below cannot erect a dam in such a manner as to raise the water and obstruct the wheels of the first occupant. He had an equal right with the proprietor below to a reasonable use of the stream ; he had made only a reasonable use of it ; his appropriation to that extent, being justifiable and prior in time, necessarily prevents the proprietor below from raising the water, without interfering with a rightful use already made; and it is therefore not an injury to him. Such appears to be the nature and extent of the prior and exclusive right, which one proprietor acquires by a prior reasonable appropriation of the use of the water in its fall ; and it results, not from any originally superior legal right, but from a legitimate exercise of his own common right, the effect of which is, *de facto*, to supersede and prevent a like use by other proprietors originally having the same common right. It is, in this respect, like the right in common, which any individual

has, to use a highway ; whilst one is reasonably exercising his own right, by a temporary occupation of a particular part of the street with his carriage or team, another cannot occupy the same place at the same time.

But such appropriation of the stream to mill purposes, upon the principles stated, gives the proprietor a prior and exclusive right to such use only so far as it is actual. If, therefore, he has erected his dam and mill, with its waste ways, sluices and other fixtures necessary to command the use of the water to a certain extent, and there is a surplus remaining, the proprietor below may have the benefit of that surplus. If he erects a dam and mills, for the purpose of using and employing such surplus, he is, as to such part of the stream, the first occupant, and makes the first appropriation. As to that, therefore, his right is prior and exclusive. And although the proprietor above might, in the first instance, have raised his dam higher, keeping within the limits of a reasonable use, yet after such appropriation by the proprietor below, he cannot raise his dam and take such surplus ; because, as to that, the lower proprietor has acquired a prior right.

So the proprietor above may, in like manner, make any reasonable use of the stream and fall of water which he can do consistently with the previous appropriation of the proprietor below. If, with a view of gaining an advantage to his mill, in low stages of water, which may occur perhaps during the greater part of the year, he places his mill so low that, in high stages of water, the dam below will throw back water on his wheels, he may do so if he choose, because he thereby does no injury to any other proprietor. But if he sustains a damage from such back water, it is a damage resulting from no wrong done by the lower proprietor who had previously established his dam, and it is an inconvenience to which he subjects his mill for the sake of greater advantages; and he has no cause to complain.

Another consequence from this view of the rights of successive proprietors to the use of the fall of water, on their respective lands, is this ; that where one has erected a dam and mill on his own land, to a given height, and thereby appropriated as

much water as he has occasion for, and there is still a surplus, he has the same right as any other proprietor to appropriate that surplus. If, therefore, before any other person has erected a dam above him or below, so near as to be injured by the change, he elects to appropriate the surplus, or a part of it, he may either raise his dam higher, and thus create a greater head above, or place his wheels lower, so as to discharge the water at the race at a lower level, and thus appropriate to himself such surplus water and power of the stream. In regard to such surplus, he will still be the first occupant.

One other consideration of a general nature, applicable to this subject, it may be proper to advert to. It is obvious that these rights to the use and power of flowing water, whether it be the original right belonging to each successive proprietor to the flow of the water in its natural channel over his own land, or the same right modified by actual appropriation, may be granted away, or acquired, or may be limited, enlarged or qualified, by grant from the proprietor in whom either of them is vested, or by that exclusive, adverse and continued enjoyment which is regarded in law as evidence of a grant. If, therefore, one has enjoyed a particular use of the stream and water, or water power, for a period of twenty years, even though such use would not have been warranted by his original right to the natural flow of the stream — as by diverting it, or raising it unreasonably high, or otherwise — he will be presumed to do it by virtue of a grant from all those whose rights are impaired by such use ; and thus his right to continue so to use it will be established. But if he shall thus exceed the equal, common and original right, thus belonging to him as a proprietor, and not justify such use by grant or prescription, it will be deemed a disturbance of the rights of those whose beneficial use and power of the stream are thereby diminished.

Supposing these principles to be well founded, let us proceed to apply them to the present case. The plaintiff is the owner of the upper mill, and he claims it under Wilson, who took it under a deed from Hall and others, who were, at the time, proprietors of the lower mill. It is then argued, that if the proprietors of the lower mill ever had a right to keep up their dam to

the height at which it stood at the time of this conveyance, it was an easement; that it was extinguished by unity of ownership; that, consequently, when they conveyed their upper mill, without reserving an easement anew for their lower mill, the easement was gone.

There is some danger of being misled by names, and by analogies between things which are alike in many respects, but not in all. The right to the use of flowing water is, in many respects, like an ordinary easement, but not in all. The right to the use of the flow and fall of the water *on* the land of the proprietor is not an easement; it is inseparably connected with and inherent in the land, is parcel of the inheritance, and passes with it. The right to have the water flow to one's land over that of the upper proprietor, and to flow from it over the land of the lower proprietor, is more like an easement, because it is a right to some benefit in the estate of another. But it does not necessarily follow that, like a common easement, it is extinguished by unity of ownership between the dominant and the servient tenants. The right to the use of the water is inherent in the land, and in each parcel; but it is a right *publici juris*, and subject to the rules of law securing to each successive proprietor the like use. If the owner of a large tract, through which a watercourse passes, should sell parcels above and below his own land retained, each grantee would take his parcel with a full right, without special words, to the use of the water flowing on his own land, as parcel, and subject to the right of all other riparian proprietors to have the water flow to and from such parcel. There is no occasion, therefore, for the grantor, in such case, to convey the right of water to the grantee, or reserve the right of water to himself, in express words; because, being inseparable from the land, and parcel of the estate, such right passes with that which is conveyed, and remains with that which is retained. Treating the right as inherent in the land, attaching to each parcel through which the stream passes, and the right to have water run to and from the land of each proprietor, over that of all others, as an easement or service, each parcel is, in turn, a dominant and servient tenement; dominant, to secure the proprietor's own right

and servient, to secure the rights of others. If, therefore, such easement is extinguished by unity of ownership, it is created anew by every new division or severance of ownership; and this consequence necessarily results from the nature of their rights. These principles arise from the nature of the inherent and original rights of proprietors to the common and equal use of the flow of a stream; but they apply, with equal force, to the modified rights of owners in the same stream, as acquired and appropriated by actual, prior, reasonable use and enjoyment.

The right, then, which Hall and others, at the time of their conveyance of the upper mill to Wilson, had in the lower mill, and in the flow and fall of the stream, as modified by an appropriation by means of the dam and fixtures then established, was not a mere easement which had been extinguished by unity of ownership, but was parcel of the estate; and no part of it would pass by their deed of the upper estate to Wilson, without express words. The deed from Hall to Wilson — and those of the other tenants in common are substantially like it — is as follows: "One fourth undivided part of a certain tract or parcel of land situated in Medway," (described,) "together with one fourth undivided part of the privilege of water, creek, factory, saw mill, dwelling-houses and other buildings situate on the premises, and of the water wheels, main gears, main drums, connected with the said factory and saw mill, and of all the privileges and appurtenances thereunto belonging."

This deed certainly conveys nothing, in terms, but the mills and mill privileges, and the land over which the stream passes. Does it, by implication, extend further? If we are right in the principles stated, then a deed of land over which a watercourse passes will convey the right of the grantor as it then actually exists. If it be a stream wholly unoccupied, the grantee will take it, with a right to make a reasonable appropriation of the use of the whole stream. If it has been partially appropriated, he will take the land and watercourse, with a right to such use as can be made of it consistently with the right of other riparian proprietors, modified by their prior rightful appropriations. If the stream have been so fully occupied that the grantee cannot

raise his dam without throwing back water upon the proprietor above, nor require the proprietor below to remove his dam, or reduce its height, because he has only exercised his just right of appropriation, then the grantee takes the land with the right to the flow and power of the water, as it then exists, on the land conveyed, and no more.

Such appear to us to be the effect and legal operation of the deed above stated, so far as it regards the estate next below, which alone is now in question. The removal or reduction of the grantor's dam below, although it might increase the power and value of that above, was not necessary to the use and beneficial enjoyment of the estate granted; and no implication arises from that consideration. We can see nothing to extend the operation of this deed beyond the plain import of its terms, which was, to carry the land, mills and water power, as it was then modified and appropriated by the dam below.

And we think the same answer applies to the argument drawn from the qualified covenant of warranty, by the grantors, against all incumbrances brought upon the premises by them. The right to the use of the water below the granted premises, as modified by the appropriation previously made for the lower mill, was not, in legal contemplation, an incumbrance, but rather in the nature of parcel of such lower estate. One mode of testing this is, to inquire what would have been the operation of a general covenant of warranty, in this deed, against incumbrances, if the lower mill, with the rights of water appropriated to it by the existing dam, had been owned by a third person. Would the existence of the lower dam, with the existing right of raising water by it to the height at which it then stood, have been an incumbrance for which the grantors would be liable on such covenant? We think it would not. So we think this qualified warranty against incumbrances brought on the estate by themselves was not broken; because their maintaining their lower dam, to the height to which the water had been appropriated for its use, was not an incumbrance upon the estate granted.

The next claim of the plaintiff is this; that he had a right, founded upon the usage and practice of his grantors, to open

the waste gates of the middle dam, and thereby relieve his own mill from back water; and that the defendant, by taking down the middle dam, and erecting a new dam further down the stream, had either prevented him from the exercise of this right, or rendered the exercise of it more onerous and expensive. The court are of opinion, that this claim cannot be sustained. At the time of the practice relied on, the grantors were owners of both mills, and might favor one at the expense of the other, as the exigencies of their business might require, or at their own mere pleasure. But no right could be founded on such practice; because it was not adverse. When the estates were severed, and the rights of the respective proprietors became adverse, they stood upon the same footing as if no such usage had existed. The damages, therefore, which were given by the jury, for the violation of this supposed right, must be deducted from the verdict. The removal of the dam of the defendant some hundred feet lower down the stream, if it made the same appropriation of the stream as was made by the mill and dam as they stood before, and no larger, was not an injury to the plaintiff, but was a just exercise of the defendant's own right.

But, for the reasons already given, the court are of opinion, that the defendant had no right to erect his new dam higher than his old one, so as to appropriate an increased portion of the stream to his own use, and thereby set back water upon the mill wheels of the plaintiff. The jury having found that he had so raised his dam, to the injury of the plaintiff, and assessed damages therefor separately, we think the verdict must be amended, so as to stand as a verdict for the latter sum only, and that judgment be rendered thereon for the plaintiff.